# Bernstein *v.* Humes *et al.*

## *Statutory Action in Nature of Ejectment.*

1.  *General exception to charge.*—A general exception to an entire affirmative charge, consisting of several distinct propositions, can not be sustained, unless every part of the charge is erroneous.

2.  *Plea of not guilty, and disclaimer.*—The plea of not guilty is an admission of possession by the defendant (Code of 1876, §§ 2962-3), and is equivalent to the consent rule at common law; and when it is pleaded, the defendant can not also enter a disclaimer.

3.  *Charge referring construction of deeds to jury.*—It is the duty of the court to construe deeds, or other written instruments offered in evidence; and a charge which refers their construction to the jury is erroneous.

4.  *Charge misleading jury.*—A charge which is indefinite, or has a tendency to mislead the jury, is properly refused.

5.  *Statute of limitations; suspension during the war, and judicial knowledge thereof; computation of time.*—The late civil war prevailed, as this court judicially knows, from 1861 to 1865; and the statutes of limitations were suspended from the 11th January, 1861, to the 21st September, 1865. Consequently, the statute of limitations of ten years can not bar an action commenced in July, 1871, unless the adverse holding commenced fourteen years, eight months, and ten days before the writ was sued out.

6.  *Sale of lands under execution against mortgagor; title of purchaser.*—When a mortgage reserves no right of possession in the mortgagor, or the law-day has passed, nothing but an equity of redemption remains in the mortgagor, and a purchaser under execution against him does not acquire such title as will sustain an ejectment; but, where the mortgage reserves to the mortgagor the possession and enjoyment of the property, with the right to use and rent it, until default shall be made in the payment of the secured bonds, extending through several years, this is a clear legal right, which is subject to levy and sale under execution against him; and a purchaser at the sale would acquire a title on which he might recover, in ejectment, against any one who does not show a paramount title.

7.  *Conveyance of land adversely held.*—A conveyance of lands, which are at the time in the adverse possession of a third person, under claim of ownership, though without color of title, is void as against the adverse holder, and the grantee can not recover against him in ejectment; and this principle applies to a voluntary conveyance by a purchaser at a sale under execution,

APPEAL from the Circuit Court of Madison.

Tried before the Hon. LOUIS WYETH.

This action was brought by Mrs. E. C. Humes and others, against Morris Bernstein ; and was commenced on the 12th July, 1871. The complaint was in the form given in the Revised Code (p. 677), and the premises sued for were thus described : "The following tract, or parcel of land, situated in the city of Huntsville in said county of Madison, known and described as follows : part of lot number seventeen in the original plan of said city, fronting on Gallatin street, commencing on said street, ninety-nine feet from north-west corner of said lot number seventeen, and running thence southwardly, along said street, thirty-eight and one-half feet ; thence eastwardly, and at right angles with said street, one hundred and sixteen and one-half feet ; thence northwestwardly, on a line parallel with said street, thirty-eight and one-half feet ; thence westwardly, at right angles with said street, to the beginning ; also, another part of said lot, commencing at the north-east corner of that part above described, running northwardly, on a parallel line with Gallatin street, ninety-nine feet ; thence westwardly, and at right angles with said street, two feet ; thence southwardly, and on a line parallel with said street, ninety-nine feet ; thence eastwardly, at right angles with said street, to the beginning." The defendant pleaded—1st, that he was not, at the commencement of the suit, in the possession of the premises sued for, or any part thereof ; 2d, not guilty ; 3d, a suggestion of adverse possession for more than three years, and the erection of valuable improvements ; 4th, the statute of limitations of ten years; and issue seems to have been joined on all these pleas, without objection.

The premises sued for were situated in a square, or block, which was bounded on the north by Clinton street, east by Jefferson street, south by Randolph, and west by Gallatin street ; and this square was subdivided, according to the original map of the city, into four lots, numbered 17, 18, 25, and 26, respectively ; each lot measuring one hundred and forty-seven feet and six inches in width, and the same in length. Lot number seventeen was the north-west quarter of the square, and the defendant owned the north-west corner of it. The plaintiffs owned nearly the whole remaining part of the square, their lands adjoining the defendant's on the east and south. Of the two fractional lots sued for, the one fronting thirty-eight and one-half feet on Gallatin street was the southern part of the premises claimed by the defendant, and the narrow strip two feet in width was on the east. The main controversy was in reference to the large lot ; the only question as to the other being, whether the division fence was on the proper line. The plaintiffs claimed the premises

sued for as a part of the property which once belonged to the old "Bell Tavern," and afterwards to the "Huntsville Hotel Company;" and they deduced their title from the said company, under a deed from the United States marshal to L. P. Walker, as the purchaser at a sale under execution against the company, and a deed from said Walker to themselves, as hereinafter more particularly stated.

The plaintiffs introduced a great many deeds in evidence, commencing with a deed from Leroy Pope, who held under a patent from the United States granted in 1809, to one Henry Cannon, dated the 29th August, 1816, and conveying the whole of lot No. 17; and thence tracing the title of said lot, and of the other lots in the block, down to the vendors of the hotel company. The descriptions contained in these several conveyances greatly varied from each other. In one of these deeds, dated the 4th February, 1823, there is a reservation of "twenty-five feet in front, *where the brick house on said lot now stands,* running back seventy-four feet nine inches at right angles;" and this reservation is continued in several subsequent deeds. In another deed, dated March 4, 1833, the description of the lot conveyed is, "that certain lot number seventeen, fronting on Gallatin street fifty feet, and extending eastwardly seventy-three feet;" and this description is continued through all the subsequent deeds, sometimes with the additional words "known as the lot formerly owned by Isaac Jamison," down to 21st October, 1847, when James Woods and wife conveyed it, as part of the "Bell Tavern Property," to R. M. Kinkle. who, on the 3d June, 1851, in like manner conveyed to Geo. W. Lane and Z. P. Davis. On the 14th March, 1856, Lane and Davis conveyed the entire property to the "trustees of the North Alabama College;" and said trustees, by deed dated the 16th April, 1857, sold and conveyed to the "Huntsville Hotel Company." In each of these last deeds, the lot is described as "part of lot number seventeen, fronting on Gallatin street fifty feet, and extending eastwardly seventy-three feet, known as the lot formerly owned by Isaac Jamison."

On the 7th February, 1870, the United States marshal sold, under execution against said hotel company, all its lands in said square, L. P. Walker becoming the purchaser, and receiving the marshal's deed. The lands were described in this deed as "lots number seventeen, eighteen, twenty-five, and twenty-six," bounded north by Clinton street, south by Randolph street, east by Jefferson street, and west by Gallatin street. On the 22d May, 1871, Walker conveyed by quit-claim deed to the plaintiffs, describing the property as it was described in the marshal's deed to him, and recit-

ing that he became the purchaser at the marshal's sale, by the request of Reuben Chapman, for the use and benefit of Mrs. Felicia A. Chapman, his wife; that Mrs. Chapman had since died, leaving her children, the grantees, her only heirs; that he, Walker, desired to divest himself of all title to the lands, and that he conveyed to said children by the written request and direction of said Reuben Chapman, indorsed on the deed. Chapman's indorsement on the deed, which is under seal, and dated the 22d May, 1871, is in these words: " The above and foregoing conveyance is made by my request, under my instruction and direction, and is a full and complete discharge of the said L. P. Walker, of and from all duty and liability resting on him by virtue of the aforesaid conveyance to him by said marshal. In witness," &c.

The documentary evidence introduced by the defendant consisted of the following deeds: 1st, a deed from Benjamin Patterson and wife to Daniel B. Turner, dated August 9, 1842; 2d, a deed from Daniel B. Turner and wife to Mrs. Lucy G. Hill, dated the 19th December, 1846; 3d, a deed from Mrs. Hill to J. D. Battle, Eugene Stroud, and James W. Steele, dated the 19th April, 1858; 4th, a deed from said Battle, Stroud and Steele, with their wives, to R. W. Chappel, dated the 20th December, 1861; and, 5th, a deed from said Chappel and wife to defendant, dated the 21st December, 1861. In Patterson's deed to Turner, the premises conveyed are described as "part of lot number seventeen in the plan of said town, lying on Clinton street, being the same on which John G. Bingham and his family formerly resided, and which was formerly owned by Isaac Jamison," with a reference to the deed under which Patterson held; and the same description is contained in the deed of Turner and wife to Mrs. Hill. The deed of Mrs. Hill to Battle, Stroud and Steele conveys three lots, or parcels of land, which are thus described: "Parts of lot number seventeen in the plan of said town, commencing at the north-west corner of *the little brick house on Gallatin street*, and running thence eastwardly, at right angles with said street, and parallel with Clinton street, seventy-four and a half feet, to a stake; thence, at right angles to Clinton street; thence, west, to the north-west corner of said lot; thence, south, along Gallatin street, to the beginning, being about sixty-seven feet, and containing not quite one-eighth of an acre. Also, another lot of land, being part of said lot number seventeen, lying east of the above-described lot, known as the lot on which John G. Bingham once lived, and owned by Isaac Jamison; sold as his property to Benjamin Patterson, by John F. Mills as sheriff; by Patterson sold to D. B. Turner, and by him to said Hill;

bounded on the east and south by the 'Bell Tavern lot.' Also, another lot of land, being part of said lot number seventeen, bounded on the north by the lot first above described, on the east by the lot last above described, on the south by the 'Bell Tavern lot,' on the west by said Gallatin street, supposed to front on said street about twenty-five feet, and to run back east about seventy-four feet." This deed contained full covenants of warranty as to the two lots first described, but was only a quit-claim to the third lot, conveying only such title as the grantor might have, "whether good or bad." The subsequent deed of Battle et al. to Chappel, and Chappel's deed to the defendant, contained the same description of the lands, and each was a quit-claim only to the lot last described.

On the trial, the plaintiffs first introduced Thomas J. Taylor as a witness, "the former surveyor of Madison county, who stated that, in the early part of the year 1871, before the commencement of this suit, he made a survey and plot of the lot sued for; that he was unable to locate the lot, by any deed through which the plaintiffs claim; that it was described in said deeds as part of lot seventeen, fronting fifty feet on Gallatin street, and running east seventy-four feet, but no place of beginning or ending was given, and there was nothing referred to in the deeds by which he could locate the lot; that he located the lot by measuring the lot called for in defendant's deeds, and found that, under his deeds, he was only entitled to ninety-nine (99) feet front on Gallatin street; that this left fifty feet, for which he could find no deed, and, as no one had any deed to it, he supposed it to be the fifty feet lot called for in plaintiffs' deed; that the lot, at the time he made said survey, was inside the defendant's inclosure, and had a fence around it, and a house on it; that some one was living in the house, but he did not know who it was; that his only reason for supposing the lot to be the fifty feet called for by plaintiffs' deed was, that he could find no deed for it, and it was not included in the lots described in the defendant's deed; that the lots inclosed by the defendant fronted on Gallatin street one hundred and thirty-seven feet and six inches, while he was only entitled under his deeds to ninety-nine feet, thus overreaching on the lot supposed to be plaintiffs' thirty-eight feet and six inches on Gallatin street; and that he found, also, by measuring defendant's lot, that he had inclosed two feet on Clinton street, and running back seventy-four feet, which was not called for by his deeds." The defendant objected to the testimony of this witness, and also to the plot and survey made by him, which was introduced as a part of the testimony of the wit-

ness; and he reserved exceptions to the overruling of his objections.

"The plaintiffs introduced Jacob Gurley as a witness, who testified, that he leased the lot in controversy after the close of the late war; that the lot then had no fence on the side fronting Gallatin street, and had a fence running about half way across the lot on the south side; that he moved the fence from the north and east side, and put it on the west and south side of the lot; that the fence on the south side, next to the hotel property, was put on the line with that portion of the fence which was standing on the south side of the lot, and running east and west; that the contract between him and Bernstein was, that he was to have the use of the place for three years, free of rent, for building the fence and house; that he remained continuously in the actual possession of the lot, as Bernstein's tenant, paying him rent, until about two months ago, when he locked up the house, gave the keys to Bernstein, and returned the lot to him; and that he was in the actual possession, as Bernstein's tenant, during all of the years 1870 and 1871."

"The plaintiffs introduced one Pollard as a witness, who stated, that he had been living in Huntsville for many years, and knew the property in controversy : that he recollected the stable which stood on lot twenty-six, which was immediately south of lot seventeen; that Mrs. Hill's lot is in lot seventeen; that she had fenced up her lot, and was living on it, and had extended her fence so as to inclose the lot on which the little brick house stood; that the little brick house lot was on the south side of her lot, and run down south to the hotel property; that the stable on lot twenty-six fronted on Randolph street, which was the southern boundary of the hotel property, and run back north to Mrs. Hill's lot; that a part of the stable was of brick, and a part frame; that he helped to build the frame part, about the year 1848; that the brick part was about sixty-five or seventy feet long, and the frame part about seventy-five or eighty feet; that Mrs. Hill's fence, on the south side of her lot, was immediately up to the stable; that he believed the house Jacob Gurley put up is not on the little brick house lot, but is on a part of the hotel lot; that he had never measured the lot, to see if it was on the hotel property, but formed his opinion by looking at the lot.

"The plaintiffs then introduced Andrew Johnson as a witness, who stated, that he married a daughter of Mrs. Hill's, and lived with her from 1846 to 1858; that there was a lot south of Mrs. Hill's lot, on which stood a little brick house; that Mrs. Hill extended her fence, and inclosed that lot, about

1846; that said lot fronted on Gallatin street, about twenty-five feet; that Mrs. Hill continued to occupy and use that lot, until she sold it, in 1858; that she had it inclosed with a fence all the time until she sold it; that she sold it to Battle and Steele, in 1858, but did not warrant the title to the little brick house lot; that the owners of the hotel property never set up any title to the little brick house lot; that the house Gurley built, he thinks, is not on the little brick house lot, but is on the lot owned by the hotel company; that he has never measured it to see, and knows nothing of the lot in controversy.

"It was admitted, as a fact proved in the case, that the purchase of the hotel property by Walker, at the marshal's sale, was for the sole benefit of Mrs. Chapman, the mother of plaintiffs; that she was the real purchaser at said sale, and Walker had no interest in it; and that he was merely a naked trustee for Mrs. Chapman, in taking to himself the conveyance of the property by the marshal." The defendant offered to introduce, "for the purpose of showing an outstanding title," a mortgage, or deed of trust, dated the 1st January, 1861, by which the "Huntsville Hotel Company" conveyed all its property to James I. Donegan and F. L. Hammond, as trustees, to secure the payment of certain bonds which said company proposed to issue, not exceeding $35,000, to enable it to borrow money to make necessary improvements on the property; and, in connection with said mortgage, to prove by R. W. Coltart, who was present at the sale of the property by the United States marshal, when Walker became the purchaser, "that the marshal gave notice at said sale that the property was sold subject to said mortgage, or deed of trust." The court sustained the plaintiffs' objections to this evidence, when offered separately, and when offered together; to which rulings exceptions were reserved by the defendant. The material provisions of said mortgage are quoted in the opinion of the court.

The defendant testified, as a witness for himself, "that he purchased the lot in controversy, from Chappel, in 1861, and took possession; that said lot was then inclosed with a fence, and remained inclosed until a portion was destroyed during the war; that he leased said lot, in December, 1865, to Jacob Gurley, for three years, and, in payment of the rent, said Gurley was to build a house and inclose said lot; that there was then a fence on the north and west side of the lot, and a fence running about half way across the lot on the south side; that the fence put up by Gurley was on the south and west side of the lot; that the fence on the west of the lot runs along Gallatin street, and the fence on the south side

[Bernstein v. Humes et al.]

was on a line with (and a continuation of) the fence already standing, just in a direct line west to Gallatin street; that all the fencing is on the same lines that stood in 1861, when he purchased said lot; that Gurley took possession of the lot under said lease, in December, 1865, and built a house on it, and fenced it up, and resided on it continuously, without interruption, as his tenant, until about two months ago, when said Gurley returned the possession to him; that said Gurley was in possession, as his tenant, when Walker purchased the hotel property at the marshal's sale, and was in actual possession, as his tenant, when this suit was commenced; that no one ever claimed said lot, after his purchase from said Chappel, as part of the hotel property, until plaintiffs set up their claim just before the commencement of this suit; that he was in possession of said lot, by his tenant, claiming *bona fide* title thereto, at the time of said marshal's sale; that he has never measured said lot, but claimed inside of his inclosure; that the only deed he claimed under was the said deed from Chappel, and he never claimed the lot sued for as bought from any one else." The defendant also introduced Z. P. Davis as a witness, who was one of the former owners of the hotel property, and one of the grantors through whom the plaintiffs deduced their title; and who testified, that he never claimed the lot in controversy as a part of the hotel property, and did not think it was called for by his deeds. There was other evidence, also, on the part of the defendant, tending to show that the lot was not claimed or recognized as belonging to the hotel property.

The court charged the jury as follows:

" When an action is brought for the recovery of land, the plaintiffs must, as a general rule, 1st, be entitled to sue; 2d, must sue one in the possession of the land; and, 3d, show, a title or right to the possession of the land superior to that of the defendant. No one, however good his title may be, can convey his right, or make a good title to another, of land which some other person has in adverse possession, claiming title thereto. This rule does not apply to sales made by a sheriff, or marshal of the United States court, under executions. But a purchaser at a sheriff's or marshal's sale can not sell the land he buys, when some one else is in adverse possession thereof. He must first recover the possession from the adverse holder. An exception to this rule exists, where the purchaser at the sheriff's or marshal's sale has purchased for another, and not for himself. In such case, he could be compelled, by bill in chancery, to make a deed to those for whom he purchased; and without such compulsion, he has the right, and ought to make it, even though, at

the time of making it, another was in adverse possession under claim of title, and such deed would vest the title in the grantees.

" 2. An action of trespass to try title must be brought against one in the actual possession of the land, as a general rule. But, if one who claims land of which, through his tenant, he has constructive possession only, but not actual possession, says anything to induce one who also claims the land to bring suit against him, and such one is induced so to do by these statements; then the defendant in such suit is estopped, by reason of his acts, from denying his actual possession of the premises sued for, and must be regarded as properly occupying the position of defendant, which he has voluntarily assumed to be.

" 3. As to the title, and the proof thereof, ordinarily, title to land is shown by written evidence—a patent from the United States, and deeds from the patentee to the plaintiffs, or to those from whom they claim, in regular procession, down to the plaintiffs. But, in this case, the defendant has tendered the plea of the statute of limitations of ten years, which, if sustained by the proof, is sufficient for his defense. For it is the law, that the uninterrupted, adverse possession of lands, under claim of title, for ten years, vests in the occupant a title to the land, upon which he may recover or defend successfully, in such a suit as this.

" If you believe, from the deeds and maps, that Jamison owned all of lot No. 17, except twenty-five feet fronting on Gallatin street, and that he conveyed by deed sixty-seven feet and six inches, from the corner of Clinton down, and fronting Gallatin street, at one time; and that twenty-five feet on the same street was sold at another, and seven feet for an alley at another, and that was all the land sold to the vendors of the defendant; then you have the right to infer that the fifty feet sued for in this case was not included in the purchase of the defendant, but was the fifty feet purchased by the one under whom the plaintiffs claim; and that the ninety-nine feet six inches, exclusive of this fifty feet, and commencing at the corner of Clinton street, was all the defendant was entitled to by his deeds of conveyance.

" If one purchases land from another, and takes a deed of conveyance therefor, the jury may infer that the land mentioned in the deed was all he purchased at the time. When a person takes possession of land without a deed, and incloses it, improves it, and exercises open and notorious acts of ownership over it, his improvements and inclosure limit the extent of his adverse possession. But, if he takes possession of land under a deed, the deed shows the extent of

the adverse possession; and if a party takes possession of land not called for in his deed, his possession is not adverse as to the portion not called for in his deed. Apply these principles to the facts, as proven in this case, and render your verdict."

" Defendant excepted to the charge of the court, and asked the court to give the following written charges to the jury; each of said charges being first reduced to writing, and the court asked to give them to the jury as written charges:

" 2. If you find, from the evidence, that at the time plaintiffs commenced this suit, Jacob Gurley was in the actual possession of the lot, as a tenant of the defendant, you must find for the defendant.

" 3. If Jacob Gurley was in the actual possession of the lot at the time this suit was commenced, the mere verbal declaration of possession by Bernstein would not authorize the plaintiffs to bring the suit against him, and you must find for the defendant.

" 4. Before the plaintiffs can recover in this action, they must prove that, at the time Walker made the deed to them, he, Walker, was in the possession of the lot, claiming the same, or exercising acts of ownership over it; and if plaintiffs have failed to prove this, you must find for the defendant.

" 5. If you find from the evidence that, at the time the marshal sold the lot to Walker, Bernstein was in the possession of the lot, either himself or by his tenant, claiming title, Walker did not purchase a perfect legal title, but only a right of property which could be reduced to possession by action; and Walker could not convey a title to plaintiffs, unless he reduced the lot to possession before making deed.

" 7. If, at the time Walker purchased the lot sued for at the marshal's sale, Bernstein, either by himself or tenant, was in possession of the lot, exercising acts of ownership over it, and claiming it as the property of Bernstein, then Walker did not purchase a perfect title, but only a right of property, which could be reduced to possession; and if Walker conveyed the lot to the plaintiffs, while it was in the possession of Bernstein, or his tenant, the deed is void as to Bernstein, and you must find for the defendant.

" 8. If Bernstein, either by himself or his tenant, was in the possession of the lot sued for, claiming as Bernstein's property, and exercising acts of ownership over it, at the time the marshal sold it to Walker, and continued such possession up to and subsequent to the time Walker conveyed the property to the plaintiffs in this suit; then the deed of Walker is void as to Bernstein, and you must find for the defendant.

[Bernstein v. Humes et al.]

"9. If, at the time Walker purchased the lot sued for, at the marshal's sale, Bernstein, either by himself or tenant, was in possession of said lot, asserting *bona fide* claim of title to said lot, and exercising acts of ownership over it, and continued such possession until the commencement of this suit; and Walker conveyed said lot to plaintiffs, without reducing the lot to possession; the deed is void as to Bernstein, and the plaintiffs cannot recover in this suit.

"11. If you find that Bernstein, and those through whom he claims, have had possession of said lot sued for, claiming it as their own property, and exercising open and notorious acts of ownership over it, such as fencing it up, and cultivating or improving it, and have continued such possession for more than ten years before the commencement of this suit; such possession, of itself, gives the defendant a title by lapse of time, although there was no color of title, and the original entry on the lot was a trespass; and you must find for the defendant.

"12. If plaintiffs' attorney, at the time of the interview with Bernstein, knew that Jacob Gurley was in the actual possession of the lot sued for, the verbal declaration of Bernstein, that he was in possession of the lot, would not estop Bernstein from showing that he was not in possession of the lot.

"13. If you find that Mrs. Hill fenced up the lot sued for, and exercised acts of ownership over it, and sold it; if her possession, added to the possession of the persons to whom she sold, makes ten years before the commencement of this suit; then the defendant has a title to the lot by lapse of time, and you cannot find for the plaintiffs.

"16. If there is nothing contained in the deed, by which the lot can be identified and located, it is void for uncertainty.

"17. If the deed shows, upon its face, that the description of the lot is so uncertain and indefinite that it cannot be located and identified, then it is a patent ambiguity, and cannot be helped by extraneous circumstances, and is void for uncertainty.

"18. If the deed does not describe the lots by metes and bounds—if there are no monuments referred to in the deed; no abuttals given in the deed, and nothing referred to in the deed by which the lot can be identified and located, the deed is void for uncertainty.

"21. When plaintiffs rely upon a deed to show title, they must show title by matter contained in the deed.

"22. Plaintiffs cannot prove any extraneous circumstances, not referred to in *his* deed, to identify and locate the lot,

[Bernstein v. Humes et al.]

when the description in the deed shows upon its face that it is void for uncertainty.

"23. If the plaintiff's deed, describing the land, is so indefinite and uncertain that it cannot be identified and located, the plaintiff cannot prove his title by showing that the defendant has no deed calling for the lot in controversy.

"24. If Z. P. Davis and G. W. Lane, through whom plaintiffs claim title to the lot in controversy, recognized and treated Mrs. Hill's fence as the boundary of the hotel property; and Mrs. Hill, and those who claimed title to the lot through her, occupied and claimed all the lot up to the fence, for more than ten years before this suit, then the fence would be the boundary between the two proprietors, whether the fence was on the true line or not.

"25. If you find from the evidence that the description of the lot sued for is so indefinite and uncertain in plaintiffs' deeds, that it can not be identified and located by matters contained in their deed, or by anything referred to in their deed, plaintiffs can not prove their title by showing that defendant has none, and measuring off the land called for by his deed, and claiming that portion not called for in his deed."

"The court refused to give each and all of said written charges, numbering from 2 to 25, both inclusive, and defendants excepted to the action of the court in refusing to give each and all of said charges. And now, to the ruling of the court in refusing to allow the said mortgage, or deed of trust, to Donegan and Hammond, to go to the jury as evidence, and to the refusal of the court to allow the testimony of R. W. Coltart to go to the jury as evidence, and to the general charge of the court, and to the refusal of the court to give the written charges asked by the defendant, the defendant excepts," &c.

The several rulings of the court on the evidence, and in the charges given and refused, to which exceptions were reserved, as above stated, are now assigned as error.

BRANDON & JONES, for appellant.—1. In ejectment, the plaintiff can not recover, unless he had, at the commencement of the action, a legal (as distinguished from an equitable) right, and the right of possession.—*Williams v. Hartshorn*, 30 Ala. 211. And he must recover on the strength of his own title, without regard to the strength or weakness of the defendant's title.—*Brock v. Younge*, 4 Ala. 584.

2. The description in the several deeds under which plaintiffs derive title is, "also, part of lot number seventeen, fronting on Gallatin street fifty feet, and extending eastwardly seventy-three feet." According to the testimony of

(38)

the practical surveyors, the lot can not be located by this description, no point of beginning or ending being given; and the deeds are void for indefiniteness and uncertainty, on account of this patent ambiguity.—*Pollard v. Maddox,* 28 Ala. 321–25; *Boardman v. Reed & Ford,* 6 Peters, 328; *Cooper v. Glover,* 4 Mass. 305; 1 Greenl. Ev. §§ 297, 300, 301, 350. The plaintiffs must prove a continuous title—a complete chain; and if any of the deeds in the chain of title are void, lapse of time will not prove them, and the whole title fails.—*Jenkins v. Noel,* 3 Stew. 60; *Hathaway v. Clark,* 5 Pick. 490; 1 Greenl. Ev. §§ 25–6.

3. If Walker's deed to plaintiffs conveys the lot sued for, the defendant should have been allowed to prove the outstanding title in Donegan and Hammond. Walker, by his purchase at the marshal's sale, acquired only the equity of redemption in the mortgaged premises; and that is all he conveyed to the plaintiffs, if he could convey that much. *Barker v. Bell,* 37 Ala. 354; 31 Maine, 246; 13 Vermont, 129. But Walker's purchase was for the benefit of Mrs. Chapman; and on her death, her husband was entitled to a life-estate, and the remainder was in her children. Chapman's consent that Walker should convey to the children, does not relieve the deed of its champertous feature; it is the same, in effect, as a deed from Walker to Chapman, and from Chapman to the children, which would be champertous.—*Dexter & Allen v. Nelson,* 6 Ala. 68; *Pryor & Fisher v. Butler,* 9 Ala. 421; *Abercrombie v. Baldwin,* 15 Ala. 371; *Coleman v. Hair,* 22 Ala. 598.

4. But the proof shows, beyond all controversy, that the land was in the actual adverse possession of Bernstein, by his tenant, at the time of the marshal's sale, and long prior thereto; and Walker did not acquire, by his purchase at the marshal's sale, any title which he could convey to another, so as to authorize his alienee to recover against Bernstein. Authorities last above cited; also, *Farley v. Smith,* 39 Ala. 58; *Hines v. Chancey,* 47 Ala. 637.

5. Color of title is not necessary to constitute adverse possession, under the decisions of this court; and this is the settled law in Alabama.—*Herbert v. Hanrick,* 16 Ala. 595; *Benje v. Creagh,* 21 Ala. 151; *Farley v. Smith,* 39 Ala. 58; *Rivers v. Thompson,* 43 Ala. 641. See, also, Angell on Limitations, 390; *Kinchaloe v. Tracewell,* 11 Grattan, 587.

6. Possession by Bernstein, and those to whose estate and rights he has succeeded, claiming the lot as their own property, and exercising open and notorious acts of ownership, such as inclosing, cultivating, and improving it; such possession continuing for more than ten years before the com-

[Bernstein v. Humes et al.]

mencement of the suit, without interruption or challenge of their right,—gave defendant a title by lapse of time, although there may have been no color of title, and although the original entry was a trespass.—*Hinton v. Nelms*, 13 Ala. 222; *Herbert v. Hanrick*, 16 Ala. 595; *Benje v. Creagh*, 21 Ala. 151; *Farmer v. Eslava*, 11 Ala. 1028; Tyler on Ejectment, 126–7, 863–4, 869; *Payne's Lessee v. Skinner*, 8 Ohio, 159; *Bauman v. Grubbs*, 26 Indiana, 419; *Abram's Lessee v. Will*, 6 Ohio, 164; *Doe v. Herrick*, 14 Indiana, 242; *Overfield v. Christie*, 7 Serg. & R. 177; 2 Penn. 452.

7. When co-terminous proprietors recognize and treat a division fence as the boundary line between them, each claiming up to the fence, and this continues for more than ten years before suit; the fence becomes the boundary between the proprietors, whether it is on the line or not, and each is bound by it.—Angell on Limitations, § 393; *Brown v. McKinney*, 9 Wharton's Pa. Rep. 567; *Burrell v. Burrell*, 11 Mass. 296; *Brown v. Cockerell*, 53 Ala. 38–46.

8. The 4th, 5th, 7th, 8th, and 9th, of the charges asked by the defendant below, are supported by the following cases, and should have been given.—*Hines v. Chancey*, 47 Ala. 637; *Clay v. Wyatt*, 6 J. J. Mar. 584; *Young v. McCampbell*, 6 J. J. Mar. 490; *Dubois v. Marshall*, 3 Dana, 336; *Frizzle v. Beach*, 1 Dana, 211; *Jones v. Chiles*, 2 Dana, 35; *Saunders v. Groves*, 2 J. J. Mar. 407; *Violett v. Violett*, 2 Dana, 325; *Coleman v. Hair*, 22 Ala. 596; *Dexter v. Nelson*, 6 Ala. 68; *Pryor v. Butler*, 9 Ala. 409; *Abercrombie v. Baldwin*, 15 Ala. 363.

9. The 2d charge asked should have been given. Its refusal instructed the jury, in effect, that it is not necessary, in actions of ejectment, to sue the party in actual possession. *Greenlee v. Bonner*, 6 Ala. 411; *Gayle v. Smith*, at June term, 1874; Barbour on Parties, 265–7; *Pope v. Pendergast*, 1 Mar. Ky. 122; *Cooley v. Penfield*, 1 Vermont, 244; *Stevens v. Griffin*, 8 Vermont, 448.

HUMES & GORDON, *contra.*—1. The general rule is, as stated by the court in the charge to the jury, that an action of ejectment must be brought against the party in actual possession. But, in this case, the defendant is estopped from denying his possession—1st, by his pleadings; and, 2d, by his declarations before suit brought, on the faith of which the action was brought against him. The plea of not guilty is an admission of possession, and is equivalent to the consent rule at common law.—Rev. Code, §§ 2613-14; *King v. Kent's Heirs*, 29 Ala. 542; *Sledge v. Swift*, 51 Ala. 386; Tillinghast's Adams, 262, n. 4; 13 Mass. 259; 12 Cal. 403; *Tongue v. Nutwell*, 17 Md. 212; 8 Cush. 183; 2 Greenl. Ev.

§ 556; *Howard v. Kennedy*, 4 Ala. 592. That the defendant is estopped by his admissions of possession, in consequence of which the action was brought against him, see *McCravey v. Remson*, 19 Ala. 430; *Harrison v. Pool*, 16 Ala. 167; *Stone v. Britlon*, 22 Ala. 543; *Grace v. McKissack*, 49 Ala. 163; *McCabe v. Raney*, 32 Indiana, 309; *Halloran v. Whitcomb*, 43 Vermont, 306; *Abeel v. Gelder*, 36 N. Y. 514; 47 N. Y. 493; 5 Bos. & P. 330.

2. The first plea is a disclaimer, as to the entire premises sued for; and this, in legal effect, is an estoppel by record, and an admission of plaintiffs' title.—Stearnes on Real Actions, 222; *Greeley v. Thomas*, 56 Penn. St. 35; *Ford v. Sampson*, 30 Barbour, 183.

3. The defendant is a mere naked trespasser, and can not defeat a recovery by plaintiffs by setting up an outstanding title in another, or adverse possession in himself.—*Herbert v. Hanrick*, 16 Ala. 581, 595; *Rivers v. Thompson*, 46 Ala. 338; *Jackson v. Hurder*, 4 John. 202; 3 Duer, 35; *Clarke v. Clarke*, 51 Ala. 498; 3 Stew. & P. 184.

4. The doctrine of champerty does not apply to judicial sales, nor to naked trust estates, whether created by the act of the parties, or by operation and construction of law. Hence, Walker might lawfully buy at the marshal's sale, and might lawfully convey to the plaintiffs, notwithstanding any claim of adverse possession by defendant.—*Baker v. Whiting*, 3 Sumner, 475–83; *Wood v. Griffith*, 1 Swanst. 56; *Allen v. Smith*, 1 Leigh, Va. 231–48.

5. The mortgage, or deed of trust, to Donegan and Hammond, reserves the possession, and other valuable rights, to the mortgagor; and these rights passed to Walker by his purchase at the marshal's sale, and gave him a title which would support ejectment. There is no proof of any default on the part of the mortgagor.

6. Chapman had no life-estate in the property purchased and held by Walker for the benefit of Mrs. Chapman; her estate therein being an equitable (as distinguished from a statutory) separate estate.— *Willis v. Cadenhead*, 28 Ala. 474; *Short v. Battle*, 52 Ala. 456.

7. The general exception to the affirmative charge of the court can not be sustained, unless the entire charge is erroneous.—*Owens v. The State*, 52 Ala. 400; *S. & N. Railroad Co. v. Jones*, at the last term.

STONE, J.—Many of the questions that have been argued with much ability, are not so presented that we can consider them. The affirmative, general charge given covers all, or most, of the questions raised by the evidence. There was a

general exception to this charge, without specifying any particular part or parts objected to. Many of its propositions are clearly free from error; and under a well-established rule of this court, we will not dissect it, with a view of ascertaining if there may not have been error in some of its utterances. Exceptions to a general charge, unless all be erroneous, must point out the parts objected to, else we will not consider them.—*Owens v. The State*, 52 Ala. 400; *South and North Ala. R. R. Co. v. Jones*, at December term, 1876.

2. The defendant interposed several pleas, and among them the general issue, "not guilty." He had also entered a disclaimer, denying that he was in possession of the lots sued for, at the time the action was brought. These defenses are incompatible, and one must overrule the other. A plea of not guilty "is an admission by defendant that he is in the possession of the premises sued for."—Code of 1876, §§ 2962-3. It is equivalent to the consent rule, which required the defendant, as a condition to controverting lessor's title, to admit the truth of the fictitious averments of lease, entry, and ouster.—See 24th Rule of Practice in Circuit Courts; *King v. Kent*, 29 Ala. 542, 556; *Clarke v. Clarke*, 51 Ala. 498; *Sledge v. Swift*, 51 Ala. 386. Under the case last cited, the defendant might have been forced to admit his possession of the premises; and refusing, his pleas might have been stricken out. We suppose this question was not brought to the notice of the Circuit Court. Had it been done, the court would have offered to the defendant the option of adhering to his disclaimer, and abandoning his pleas, or of entering into the consent rule, and going to trial on his pleas. We feel bound to hold that, by interposing the plea of not guilty, the defendant must be held to have waived his disclaimer, and to have admitted himself in possession. So, the defense that defendant was not in possession when the action was brought, in whatever form presented, will not be further noticed in this opinion. This disposes of defendant's charges numbered 2, 3, 12.

3 Several charges were asked and refused, which, in terms, referred the question of construing deeds to the jury. Charges numbered 16, 17, 18, 21, and 23, are of this class. It is the duty of the court to construe written instruments, and it is error to refer such question to the jury.—See *Price v. Mazange*, 31 Ala. 701; *Taylor v. Kelly, Ib.* 59. The court did not err in refusing these charges.

4. Charge No. 22 is somewhat obnoxious to the same objection. Asked, as it was, in connection with the charges last commented on, it was doubtless intended, and would have been so understood by the jury, as referring to them

the construction of some deed. Many deeds were in evidence, and the charge failed to inform the jury, and fails to inform us, what deed—it used the singular number.—was referred to. The language of the charge is, "Plaintiffs can not prove any extraneous circumstances, not referred to in his deed, to identify and locate the lot, when the description in the deed shows upon its face that it is void for uncertainty." The charge speaks of *his*, the plaintiffs', *deed*. The most natural inference is, that this refers to the deed made by Walker to plaintiffs. Yet, there is nothing uncertain or ambiguous in the description of the land it conveys. We think this charge objectionable on two grounds : *first*, it refers to the jury the construction of a deed ; and, *second*, it is indefinite, and its tendency would have been to mislead the jury.—1 Brickell's Dig. 338–9, §§ 36, 59, 60, 61.

5. Charges 11, 13, 24 and 25 relate to the statute of limitations of ten years. This action was commenced July 12, 1871. We know judicially that the late civil war prevailed from 1861 to 1865 ; and the statutes of limitation were suspended from January 11, 1861, to September 21, 1865 ; four years, eight months, and ten days. This suspension occurred, mainly, within the ten years immediately preceding the bringing of this suit. To effect a bar, at the time shown in this record, the adverse holding must have continued fourteen years, eight months, and ten days. Yet, each of the charges fixes the requisite time at ten years. These charges were all rightly refused.

We have now disposed of all the charges, except the 4th, 5th, 7th, 8th, and 9th. These we will consider hereafter. It is contended for appellant, that he should have been allowed to show outstanding title in Donegan and Hammond. For this purpose, he offered in evidence the mortgage, or trust deed, made June 1, 1861, by the "Huntsville Hotel Company," to Donegan and Hammond, by which it is claimed the lots in controversy were conveyed, leaving only an equity of redemption in the hotel company. Plaintiffs claim derivatively under the hotel company, by marshal's sale under execution against the company, made in 1870, purchase at such sale by Walker, and conveyance by him to plaintiffs before this suit was brought. In connection with this mortgage, defendant offered the testimony of Coltart, and proposed to prove by him that, when the marshal exposed said property for sale, he proposed to sell only the interest of the said hotel company, subject to said mortgage to Donegan and Hammond. These two instruments of evidence were offered jointly, and each separately ; and in each

[Bernstein v. Humes et al.]

form it was ruled out, on the objection of plaintiffs; and in each form, the question is presented by exception.

The mortgage, or trust deed, conveys the real and personal property of the Huntsville Hotel Company, to secure the payment, both interest and principal, of thirty-five thousand dollars of bonds the company proposed to issue, with eight per cent. interest, payable semi-annually; the principal of the bonds to be due and payable in five equal installments, of seven thousand dollars each, due on the first of January from the years 1872 to 1876, each inclusive. But the mortgage, after the granting clause, contains this language: " But, nothing herein contained shall be so construed as to prevent the Huntsville Hotel Company from using the building for hotel purposes, renting, and receiving pay therefor, of any part of said building not necessary for hotel, nor from disposing of any part of the lot or grounds upon which said building is situated, which may not be required for the use of said hotel; nor from using any furniture, stores, or fixtures, which may be necessary in conducting the business of said company, provided that no default shall have been made in the payment of the interest and principal of said bonds." The record no where informs us that the hotel company had made default in the payment of interest or principal of the bonds—(no part of the principal was due when this suit was brought)—that they had been disturbed in the quiet enjoyment of the property, or that Donegan and Hammond had asserted any right to the possession; and there was no offer to prove either of the above facts.

6. If the mortgage had reserved no right of possession in the mortgagor, or had been an ordinary one fixing a law-day, and that day had passed; then, under our rulings, there would have remained in the hotel company only an equity; and neither Walker, by his purchase, nor any one in his right, would have acquired any legal title, which is necessary to maintain ejectment; and in such case, the mortgage would constitute such outstanding title in a stranger, as would defeat a recovery, on a title such as these plaintiffs rely on. But the present mortgage is different. It secures the possession and enjoyment in the mortgagor, until default is made; and it reserves to the mortgagor powers and rights of use and disposition not often found in mortgages. Until default was made, there was clearly a legal right to hold and occupy the property, which was subject to levy and sale; and such sale, in the absence of other proof, would vest in the purchaser a right to maintain ejectment against any one who did not show a paramount title,—*Paulling v. Mead*,

32 Ala. 11; *Barker v. Bell*, 37 Ala. 354–8; *Pryor v. Butler*, 9 Ala. 418.

7. It is contended that the present action can not be maintained, because plaintiffs' deed from Walker—the title they rely on—was executed while the lots in controversy were adversely held and occupied by defendant, under claim of right. Charges 4, 5, 7, 8, and 9, seek to raise this question. It is fairly presented in the last four, if the facts of this case justify the application of the principle. The admitted facts, on which this question arises, are—that Walker purchased at the marshal's sale, not for himself, or in his own right, but in trust for Mrs. Chapman, mother of the plaintiffs. The money and means with which the purchase was made, were furnished by Reuben Chapman, her husband, and the title was made to Walker, in trust for Mrs. Chapman, at the request of Mr. Chapman. Walker neither paid, nor incurred liability to pay, any money; and the record fails to inform us for what purpose the title was taken in him, instead of Mrs. Chapman. Mrs. Chapman soon afterwards died, leaving the title in Walker; and soon after this Walker conveyed by quit-claim all the interest he had in the lands, to the plaintiffs, reciting substantially the above facts, and that the title was conveyed to the heirs of Mrs. Chapman, at the request of Reuben Chapman,' and the said Reuben indorsed on the deed his written assent to such conveyance. This conveyance, it is alleged, is obnoxious to the charge of maintenance, and therefore inoperative to convey the title. The testimony tends to show that, at the time this conveyance was made, Bernstein, by his tenant, was in possession of the land sued for, and asserted ownership and dominion over it; and it is contended that the conveyance was nothing more than a transfer of a right to sue, and therefore it will not support an action.

Against this view it is answered, that Walker had no interest in the premises—held the title in the nature of a naked trust; was compellable in equity to convey the title to Mrs. Chapman, his *cestui que trust;* that, in conveying title to her heirs-at-law, she being dead, he voluntarily did only what equity would have compelled him to do; that equity approves and regards as well done, that which ought to have been done; and that therefore this conveyance does not fall within the influence of the rule against maintenance. To this it is replied, that by the death of Mrs. Chapman—intestate, so far as we know—Reuben Chapman, her surviving husband, became entitled to a life-estate in the premises in controversy; and that the deed of Walker to plaintiffs, made as it was by the "written request," and under the "instruction

and direction " of Reuben Chapman, indorsed on the deed, is more than a mere execution of what equity would have compelled him to do ; that it is a conveyance to them of the life-estate of said Chapman, which they did not previously own, either legally or equitably ; and that, therefore, the deed was but a transfer of a right to recover the property by suit, which has all the qualities of maintenance.

The question we are required to decide is founded on a very ancient doctrine, partly common law, and partly statutory. In Coke upon Littleton, 369 *a*, it is said, " that feoffments made for maintenance shall be holden for none, and of no value ; so as Littleton putteth his case, at the common law ; . . but some have said, the feoffment is not void between the feoffor and feoffee, but to him that hath right." This author adds, speaking of the statute of 32 Henry 8, ch. 9: "Since Littleton wrote, there is a notable statute made in suppression of the causes of unlawful maintenance (which is the most dangerous enemy that justice hath), the effect of which statute is—first, that no person shall bargain, buy, or sell, or obtain any pretended rights or titles ; secondly, or take, promise, grant, or covenant, to have any right or title of any person, in or to any lands, tenements, or hereditaments ; but, if such person, which so shall bargain, &c., their ancestors, or they by whom he or they claim the same, have been in possession of the same, or of the reversion or remainder thereof, or taken the rents or profits thereof by the space of one whole year, &c., upon pain to forfeit the whole value of the lands, &c., and the buyer or taker, &c., knowing the same, to forfeit also the value. Thirdly, provided that it shall be lawful for any person, being in lawful possession, by taking of the yearly farm, rents, or profits, to obtain and get the pretended right or title, &c., of any lands, whereof he or they shall be in lawful possession." So, in Cro. Eliz. 445—*Upton v. Bassett*—the court said, "A feoffment upon maintenance or champerty is not void against the feoffor, but against him who hath right."

It is manifest that this doctrine of the common law, emphasized and made more efficient by statute, had its origin in the Feudal times, when feudal barons exercised power and authority over their vassals, and over the machinery of civil government, only subordinate to the will of an arbitrary king. The necessity for such legislation does not exist in this country of free constitutions, as it did in England, when the haughty feudal lords governed, within their sub-dominions, with despotic rule, and frequently made war, and often successfully, upon their own sovereigns. Hence, the forfeitures, and the denial of the right to aid a suitor by money

or advice in prosecution or defense of his rights, have never been engrafted on our jurisprudence. But, two of the principles of the common law and English statute, noted above, have been adjudged to be of force in this State: first, champerty, not necessary to be considered here (See 1 Brick. Dig. 334); second, a denial of the right to sell or buy real or personal property, the right to which exists only in action, and to maintain a suit in the name of the purchaser. This is treated as a species of maintenance, and is everywhere adjudged to be a complete bar to a suit by the purchaser, to recover such property, or damages for tortious injuries done to it. Damages caused by torts can not, in the ordinary acceptation of the term, be the subject of private bargain and sale.

In *Pryor v. Butler*, 9 Ala. 418, this court said: " The right acquired by Bullard, who purchased at the sale made under the mortgage, was a right to recover the lot by suit, if the possession was in another, and the possession was withheld. This right to sue, he could not transfer to another. It is an ancient doctrine of the common law, that nothing which lies in action, entry, or re-entry, can be granted over." To the same effect, see *Dexter v. Nelson*, 6 Ala. 68 ; *Abercrombie v. Baldwin*, 15 Ala. 363 ; *Abernathy v. Boazman*, 24 Ala. 189 ; *David v. Shepard*, 40 Ala. 587 ; *Hines v. Chancey*, 47 Ala. 637. See, also, this point in *Coleman v. Hair*, 22 Ala. 596. See, also, *Gibson v. Shearer*, 1 Murphy, 114 ; *Hadley v. Geiger*, 4 Halst. 225 ; *Williams v. Hogan*, Meigs, Tenn. 187 ; *Allen v. Smith*, 1 Leigh, 231 ; *Martin v. Pace*, 6 Blackf. 99 ; *Dubois v. Marshall*, 3 Dana, 336 ; *Jackson v. Demont*, 9 Johns. 55; *Van Hoesen v. Benham*, 15 Wend. 164 ; Rawle on Covenants, 65. And it is settled in this State, that, to avoid a deed thus made by one out of possession, it is enough if there be one in adverse possession, exercising acts of ownership, and claiming to be rightfully in possession. Color of title is not necessary. On the subject of transfer of mere rights to sue, see 1 Chitty's Pl. 17, 66 ; 1 Addison on Contracts, § 257.

In Tyler on Ejectment, commencing at page 935, is a pretty full discussion of this doctrine. He states it as "a general rule of the common law, that a conveyance of land, by a person against whom it was adversely held at the time of making it, is absolutely void ; and the reason of this rule, according to an ancient authority, is ' for avoiding of maintenance, suppression of right, and stirring up of suits ;' and therefore nothing in action, entry, or re-entry, can be granted over." *Absolutely void* is too strong a phrase. Such conveyance is good and binding, at least by way of estoppel, between the parties. The same author remarks, citing many

[Bernstein v. Humes et al.]

authorities, that, "so far as the law declares that a conveyance by a person out of possession, where the land is held adversely to the grantor, is void, the rule is quite generally recognized in all the American States."

In White & Tudor's Leading Cases, 4th Amer. ed., vol. 2, part 2, page 1631, is a very full discussion of the doctrine, English and American. It is there said : " The rule, that land held adversely shall not be granted, was too deeply fixed in the common law, to yield to the novel doctrine, that rights of action are not less objects of commerce, than rights attended with possession; and the assignment of a right of entry, or a contract made in consideration of such transfer, is still, in many of the States, invalid." The annotators cite many authorities in support of this proposition, and, among others, *Poe v. Davis,* 29 Ala. 676 ; an opinion by Chief Justice CHILTON, in which he places the doctrine against champerty and maintenance on very elevated ground. Among other strong expressions found in C. J. CHILTON's opinion, is the following, quoted from Lord Abinger in *Prosser v. Edwards,* 1 Younge & Col. 484 : "All our cases of maintenance and champerty are founded on the principle, that no encouragement should be given to litigation, by the introduction of parties to enforce those rights, which others are not disposed to enforce." Commenting on a relaxation of the doctrine which will be found referred to in Tyler on Ejectment, and White & Tudor's Leading Cases, *supra,* C. J. CHILTON said : "Some of the recent cases do, indeed, relax the rules which have heretofore obtained ; but we apprehend, when fully considered, they do not go the length of breaking down the barrier which the wisdom of ages has erected against the perversion of the cause of justice, by opening a door for strangers to come in and interfere in suits in which they have no interest, aside from the agreement they may make to maintain them."

The language of the New York statute is, " Every grant of lands shall be absolutely void, if, at the time of the delivery thereof, such lands shall be in the actual possession of a person claiming under a *title* adverse to that of the grantor." It will be observed that, under this statute, the adverse holding, to avoid a conveyance made by one out of possession, must be *under a title.* Adverse holding under claim of ownership is not enough. The claim, to avail, must be under some specific title. Under this statute, the rulings in that State have somewhat relaxed the rule.—See *Crary v. Goodman,* 22 N. Y. 170 ; *Laverty v. Moore,* 33 N. Y. 358 ; *Livingston v. Peru Iron Co.* 9 Wend. 511. In *Requa v. Holmes,* 26 N. Y. 338, and *Thalheimer v. Brinkerhoff,* 3 Cow. 623, the relaxation of

the rule is carried to a doubtful length. Our rulings have been steadfast and uniform, and have maintained throughout that there can be no action maintained by a transferree of the title, against one in possession, claiming adversely at the time of the transfer. The principle, with us, rests on the common law, and does not require that the adverse holder shall claim under a specific title : sufficient that he is in possession, asserts the right to retain the possession, and that his claim is adverse to that of plaintiff's grantor.

It will be observed, in the many cases on this question, we do not encounter the expressions *vendor*, or *purchaser*, except in contradistinction to a transmission of title by descent. The latter change of title is effected by the law, and does not fall within the rule. Conveyance, grant, deed, transfer ; these are the words we meet with. The right to sue can not be conveyed, transferred, or granted to another, is the language of the courts. Such is the language employed in our adjudged cases.

In the case of *Clay v. Wyatt*, 6 J. J. Marsh. 583, Green Clay, in consideration of $100, and natural love and affection, conveyed to his sons various tracts of land. Part of the land so conveyed was, at the time, in the adverse possession of Wyatt, against whom an action of ejectment was instituted, by the sons. The court said : "That the deed is void, so far as it may operate upon the land in the adverse possession of Wyatt, according to the literal meaning of the act, is too plain to admit of any doubt. But it is contended, that such a deed as the present, being obviously intended by the grantor for the advancement of his children, does not come within the spirit of the act, and that the legislature used the word purchase in its popular, and not in its technical sense ; wherefore, it is insisted, that the deed is not void. The principal object of the legislature, in passing the act in question, was to protect the occupants of land. A father might have claims which he would be unwilling to litigate in his own name, because of his liability for costs, and which he would willingly transfer to a son, a nephew, or a cousin, in consideration of natural love, and afford him an opportunity to profit by the litigation. Such a transaction would tend to defeat the main object of the legislature, which was, to throw obstacles in the way of asserting doubtful rights, to the prejudice of occupants ; and hence we think the policy of the act includes voluntary conveyances, as well as those founded on valuable considerations." This asserts a sound rule, and gives sound reasons in support of it.

In the present record, according to the agreed facts, at the death of Mrs. Chapman, Mr. Chapman, her husband, became

entitled to a life-estate in the property in controversy. The conveyance by Walker to the plaintiffs, made by the procurement and direction of Chapman, is the equivalent of a conveyance by the latter of a life-estate in the premises; for that was the *quantum* of his interest. That life-estate, so long as Chapman lived, was the only right, outside of Walker, the trustee, which could litigate, at the time, the right to the property. That right, and the legal title transferred to them by Walker's deed, constitute plaintiffs' sole right to maintain this suit. These being the facts, if, at the time Walker made his deed, Bernstein, or his tenant, was in adverse possession, claiming right to such possession, then plaintiffs can not maintain this suit. The 8th charge asked should have been given.

Three points we abstain from considering, as not being presented by this record : First, the construction of Acklen's deed, and those in continuation, conveying part of lot 17, fronting 50 feet on Gallatin street, whether void for uncertainty; second, whether Mrs. Hill's deed, and those down to Bernstein, embrace the lot in controversy ; third, whether Bernstein's possession is sufficiently connected with Mrs. Hill's, to authorize the tacking of hers to his, to make out the bar of the statute.

For the single error above pointed out, the judgment of the Circuit Court is reversed, and the cause is remanded.

BRICKELL, C. J., not sitting, having been of counsel.