# Humes *v.* Bernstein.

*Statutory Real Action in nature of Ejectment.*

1. *Map, or diagram; when admissible as evidence.*—A surveyor, or expert, testifying as to the form, configuration, or dimensions of the land in controversy, may introduce a map or diagram, made by himself, to aid in making his testimony intelligible; and such map or diagram may then be submitted to the jury, to aid them in understanding or remembering his testimony. But such map or diagram is not *prima facie* or presumptively correct, unless prepared by a county surveyor, after notice to the party in adverse interest, as provided by the statute (Code, § 868); and not having been so prepared, but made by the witness without having the title-papers before him, and admitted by him, on examination of the deeds, to be incorrect, it should not be allowed to go to the jury for any purpose.

2. *Description of lands in sheriff's deed.*—A sheriff's deed for land sold under execution, described as "part of lot number seventy (70), fronting on Gallatin street fifty (50) feet, and extending eastwardly seventy-three (73) feet," though too indefinite to authorize a recovery, is not void on its face for uncertainty; but, the lot sold being further described as "the property of Isaac Jemison & Co.," and the dimensions of lot seventy (70) being shown, extrinsic evidence would be admissible to show that Jemison & Co. only owned a part of said lot corresponding with the dimensions given in the deed, and to identify that portion.

3. *Adverse possession, and color of title under deed.*—When a vendor conveys by deed lands particularly designated, or described by numbers, metes and bounds, the purchaser acquires title, or color of title, only to

[Humes v. Bernstein.]

the lands within the designated numbers and boundaries; and if he claims adverse possession, under color of title, of adjoining lands outside of those numbers and boundaries, because his vendor was in possession thereof at the time his conveyance was executed, he must show that the possession thereof was delivered to him, as a part of the lands sold and conveyed; otherwise, he can not tack his vendor's prior possession to his own subsequent possession, for the purpose of making out a title under the statute of limitations.

4. *Effect of adverse possession on conveyance.*—To avoid a conveyance of lands made by one who is out of possession, on the ground of adverse possession in another, it is not necessary that the adverse possessor should have color of title, nor is it sufficient to show only the exercise of acts of ownership by him : to avoid the conveyance, he must be in adverse possession, " exercising acts of ownership, and claiming to be rightfully in possession."

5. *Proof and effect of acts of ownership.*—On the question of adverse holding, or of asserted claim of right, acts of ownership are legal evidence to go before the jury; but they are not the equivalent of a claim of right, which is a conclusion of fact to be drawn by the jury from all the evidence, under appropriate instructions.

6. *Judicial sales; not affected by maintenance, or adverse possession.*—A judicial sale—that is, a sale made by a public officer, under legal process —is not within the doctrine against maintenance, and its validity is not affected by the fact that the land is at the time in the possession of a third person, claiming adversely to the defendant in the process.

7. *Claim for valuable improvements, and liability for rent.*—When the defendant suggests on the record adverse possession for three years before the commencement of the suit, and the erection of valuable improvements, the statute makes provision for the manner in which, if the suggestion is found true, the value of the improvements and of the use and occupation of the land shall be set off against each other (Code, §§ 2951–54); but, he is not entitled to compensation for such improvements, unless they were erected under " the *bona fide* belief that the property was his; " and if the jury find that he erected them " in the mistaken but honest belief that the land was covered by his deed, but with no intention of claiming the lot if not embraced in his deed, then he will be entitled to the value of his improvements, but must answer for rents during the time they were being put up."

8. *Construction and operation of deed; questions for court and jury.* The construction of a deed is always a question for the court; but, when its construction and operation, as to the limits and boundaries of the lands conveyed, depend upon extrinsic parol evidence, its construction and effect should be stated to the jury hypothetically, so that they may pass upon the facts.

APPEAL from the Circuit Court of Madison.

Tried before the Hon. H. C. SPEAKE.

This action was brought by Mrs. E. C. Humes and others, against Morris Bernstein ; and was commenced on the 11th July, 1871. The premises sued for were thus described in the complaint : " Part of lot number seventeen in the original plan of said city [Huntsville], fronting on Gallatin street, commencing on said street ninety-nine feet from the north-west corner of said lot number seventeen, and running thence southwardly, along said street, thirty-eight and one-half feet; thence eastwardly, and at right angles with said street, one hundred and

sixteen and one-half feet; thence northwestwardly, on a line parallel with said street, thirty-eight and one-half feet; thence westwardly, at right angles with said street, to the beginning;" and another narrow strip of land, two feet wide, by ninety-nine feet in depth, which fronted Clinton street on the north, and run back in the rear to the lot first described. This narrow strip requires no particular notice, as the controversy, on each trial, seems to have been confined to the larger lot. The defendant pleaded—1st, "that he is not guilty of unlawfully withholding the premises claimed by plaintiffs;" 2d, "the statute of limitations of ten years;" 3d, "that defendant, and those through whom he claims, have had and held actual adverse possession of the premises sued for, under claim of title, for more than fifteen years before the commencement of this suit;" and, 4th, "defendant suggests that he, and those whose possession he has, for three years next before the commencement of this suit, have had adverse possession of the premises sued for, and have made valuable improvements thereon." Issue was joined on all of these pleas.

The square, or block, in which the premises sued for are situated, was bounded north by Clinton street, east by Jefferson street, south by Randolph, and west by Gallatin street; and it was subdivided, according to the original map of the city, into four lots of equal size, numbered 17, 18, 25, and 26, each of which measured 147 feet, 6 inches, in width, and the same in length. Lot No. 17 was the north-west fourth of the square, and the defendant claimed and had possession of the greater part, if not the whole of it; while the plaintiffs owned the residue of the square, and adjoined his premises on the east and south. The plaintiffs claimed the premises as a part of the property which once belonged to the old "Bell Tavern," and afterwards to the "Huntsville Hotel Company;" deducing title under a deed from the United States marshal to L. P. Walker, as the purchaser at a sale under execution against said hotel company, and a subsequent deed by Walker to said plaintiffs. The marshal's deed to Walker was dated February 7th, 1870, and described the property sold as "lots number seventeen, eighteen, twenty-five and twenty-six," bounded by the four streets surrounding the square, and "known as the Huntsville Hotel Company's property;" and Walker's deed to plaintiffs, which was dated May 22d, 1871, contained the same description.

The defendant bought his property from R. W. Chappell, and received a conveyance dated December 21st, 1861, in which the premises conveyed were thus described: "Parts of lot numbered seventeen in the plan of said town, commencing at the *north-west corner of a little brick house* on Gallatin street,

[Humes v. Bernstein.]

and running thence eastwardly, at right angles with said street, and parallel with Clinton street, seventy-four and a half feet, to a stake; thence, at right angles to Clinton street; thence west, to the north-west corner of said lot; thence, south, along Gallatin street, to the beginning, being about sixty-seven feet, and containing not quite one-eighth of an acre.   Also, another lot of land in said town, being part of said lot seventeen, lying east of the above described lot, known as the lot on which John G. Bingham once lived, and once owned by Isaac Jemison; sold as his property to Benjamin Patterson, by John F. Mills as sheriff; by Patterson sold to D. B. Turner, and by D. B. Turner to Lucy G. Hill; bounded on the east and south by the *Bell Tavern* lot.   Also, another lot of land, being part of said lot number seventeen, bounded on the north by the lot first above described, on the east by the lot last above described, on the south by the *Bell Tavern* lot, and on the west by Gallatin street; supposed to front on said street about twenty-five feet, and to run back east about seventy-four feet."   This description was taken from the deed which Chappell had received from his vendors, Josiah Battle and others, which was dated December 20th, 1861, and which contained covenants of warranty as to the two lots first described, but, as to the last lot, conveyed only such title as they had received in their conveyance from Lucy G. Hill, "be it good or bad;" and Mrs. Hill's deed to said Josiah Battle and others, dated April 9th, 1858, contained the same description.

The plaintiffs deraigned title as follows:   Patent from the United States to Leroy Pope, granted in 1809; deed from Pope to Cannon, dated August 29th, 1816, for said lot seventeen; deed from Cannon to Price, dated December 28th, 1818, for the same lot; deed from Price to Stokes, November 23d, 1822, for the same lot, "with the reserve of twenty-five feet, fronting on Gallatin street, *where the brick house stands*, running back seventy-four feet nine inches, at right angles;" deed of Stokes to Rogers, February 4th, 1823, for the same property, and with the same reservation; deed of Rogers to Isaac Jemison, January 31st, 1826, for the same lot, and with same reservation; deed of Acklen, as sheriff, to Elliott, April 2d, 1832, for "*part of number seventeen, fronting Gallatin street fifty feet, extending eastwardly seventy-three feet, sold as the property of said Isaac Jemison & Co.*"; Elliott to Sadler, March 4th, 1833, "all that certain piece or parcel of ground in said town of Huntsville, known as part of lot seventeen in the plan of said town, fronting on Gallatin street about fifty feet, and extending eastwardly seventy-three feet;" Sadler to Horton, April 7th, 1834, "all that certain lot [part?] of No. 17, fronting on Gallatin street fifty feet, and extending eastwardly seventy-three feet,

[Humes v. Bernstein.]

known as the lot formerly owned by Isaac Jemison;" Horton and Robinson to Caldwell, August 18th, 1838, for the same lot, described in the same words, with lots twenty-five and twenty-six, and two other lots thus described: "also, two lots conveyed by Daniel B. Turner and Benjamin T. Moore, as trustees, to Wm. E. Phillips, and therein described as follows: one, the lot purchased by the said Phillips of William McCay, on which is situated the new brick building; the other, the lot bought by said Phillips of D. B. Turner, in rear of the same, on which is erected a frame stable." In the subsequent deeds, down to the conveyance to the Huntsville Hotel Company, which was dated April 16th, 1857, all the property is conveyed by the same words of description, or words substantially the same; each including "part of lot number seventeen, fronting on Gallatin street fifty feet, and extending eastwardly seventy-three feet, known as the lot formerly owned by Isaac Jemison."

The plaintiffs introduced in evidence, also, the following deeds: (1.) "Deed of Jemison and wife to A. Rison, dated July 15th, 1826, conveying 'all that certain parcel of land,' &c., 'known as the part of lot No. 17, in the plan of said town, meted and bounded as follows: beginning on Gallatin street, *at the north-west corner of a little brick house situate* on said lot, and now occupied by James Hood, the tailor; running thence eastwardly, seventy-four and one-half feet, parallel with Clinton street, to a stake on the western boundary of a piece of land said Jemison had previously sold to one John G. Bingham; thence northwardly, about sixty-seven feet, to Clinton street; thence westwardly, with said street, to the north-west corner of said lot No. 17, seventy-four and a half feet; thence southwardly, about sixty-seven feet, with Gallatin street, to the place of beginning, containing not quite one-eighth of an acre, more or less." (2.) "Deed of A. Rison to John R. Elliott, dated March 4th, 1833," conveying the same lot, by the same descriptive words. (3.) "Deed of Isaac Jemison and wife to John G. Bingham, dated June 15th, 1827, conveying all that certain lot, or parcel of ground," &c., "known as part of lot No. 17, fronting on Clinton street, containing forty feet in front, adjoining the lot of A. Rison on the west, and running south, with his line, to an alley extending from Gallatin street up the rear line of said lots; thence up said alley until it intersects the boundary line of the lot now owned by D. B. Turner, being also part of said lot No. 17, and thence northwardly, with his line, to the front on Clinton street," with the alley seven feet wide. (4.) "Deed of D. B. Turner, as sheriff, to Wm. E. Phillips, dated April 5th, 1836, conveying one lot, or parcel of ground, in said town of Huntsville, upon Clinton street, say front thirty-three feet, more or less, and running back to the

lot known as the *Bell Tavern* lot south, and adjoining the lot of John G. Bingham on the west, sold as the property of Isaac Jemison." (5.) "Deed of Turner and Moore, as trustees of Phillips, to John M. Caldwell, dated April 11th, 1836, conveying 'all that parcel of ground in Huntsville, on which is situated the *Bell Tavern* and appurtenances, and the new brick building contiguous thereto, erected on a lot bought of Wm. McCay; also, lot bought of D. B. Turner, in rear of the same, on which is erected a new frame stable."

"For the purpose of locating and identifying the Jemison fifty-feet lot on Gallatin street, the plaintiffs then introduced the following deeds, which were afterwards introduced by the defendant, as evidence relied on by him in deraignment of his title:" (1.) "Deed of Patterson to Turner, dated August 9th, 1842, conveying lot known and described as being part of lot No. 17 in the plan of said town; being the same on which John G. Bingham and his family formerly resided, and which was formerly owned by Isaac Jemison; being the same conveyed by John F. Mills, formerly sheriff of said county, to said B. Patterson, by deed dated April 8th, 1830." (2.) "Deed of D. B. Turner to Hill, dated December 19th, 1846," conveying the same lot, by the same descriptive words. Also, Mrs. Hill's deed to Battle, Battle's deed to Chappell, and Chappell's deed to defendant, above described. These were all the conveyances introduced by either party.

The *little brick house*, mentioned in several of the deeds, was torn down prior to 1860, and the dividing fences were all destroyed during the war. Several witnesses, who had resided in Huntsville for many years, were examined orally as to the location of the little brick house, and the identity of its site with that of a house built by one Gurley, in 1867, as the tenant of defendant, and their testimony differed in material respects; some of them stating that Gurley's house was on the ground where the brick house stood, and others that it stood south of an alley which separated Mrs. Hill's property from the property of the *Bell Tavern*, and at the place used by Mrs. Kinkle as a cow-lot while she kept the tavern. R. W. Coltart, a witness for the plaintiffs, testified, " that he knew the brick-house lot; that Mrs. Hill consulted him about buying it at tax-sale, and he advised her against it; that she then extended her fence so as to include it, and continued to use it until she sold it in 1858." Britton Franks, another witness for plaintiffs, testified: " Mrs. Hill's lot did not embrace the little brick-house lot, but she fenced it in. Don't know whether she included the alley or not. The house the defendant has put up lies south of the Hill property." Z. P. Davis, a witness for defendant, who was the proprietor of the *Bell Tavern* from 1851 to 1856, testified

that he had always considered the hotel property as extending to Mrs. Hill's fence, and that Gurley's house was north of where that fence stood, according to his recollection. M. W. Steele, a witness for the defendant, who was a surveyor and civil engineer, and had been a stockholder and director of the Huntsville Hotel Company, testified that, in 1867, he was appointed by the directors of the company to make a map of the lots, and made a map, which he produced, and which gave the defendant 137 feet, 6 inches, front on Gallatin street, and included the lot where Gurley's house was then standing, giving the hotel property a front of 160 feet on that street; and that, in the preparation of this map, he did not make any examination or comparison of the deeds, but ran the line where the defendant had erected his fence south of Gurley's house. On cross-examination, the plaintiffs' several deeds being exhibited to him and compared, he further testified "that, as an expert, his conclusion was that they gave plaintiffs fifty feet more front on Gallatin street than said map allowed them; that said fifty-feet lot could be identified, and it belonged to said hotel company when said map was made in 1867; and that said map is incorrect, and does not represent the true ownership of said fifty-feet lot on Gallatin street." On this evidence, the plaintiffs objected to the admission of the map as evidence, "because it was incorrect, and was incompetent and illegal as evidence, and was calculated to mislead the jury;" and they duly excepted to the overruling of their objections.

The defendant thus testified, as a witness for himself: " That the only portion of lot No. 17 to which he ever asserted or had in fact any claim, right or title, was that included in the deed made to him by Chappell in 1861; that the fences south of the property included in his said deed were destroyed during the war; that he leased the lot south of any property described in his said deed, in 1865, to Jacob Gurley,—the terms of the contract being that Gurley was to put a house on it, and to keep up the fences around it, and in consideration thereof was to occupy the house three years; that Gurley accordingly took possession of said lot, inclosed it, and put up the house that now stands on it; that Gurley was in the occupancy of said house under this arrangement, and was paying him rent for it, at the time of the deed from the United States marshal to Walker, and at the time of the deed from said Walker to plaintiffs; and that the only improvements made upon the lot in controversy were the said house and fences erected under the arrangement and circumstances above stated."

R. Chapman, witness for plaintiffs, testified, " that the rental value of the property sued for is ten dollars per month, payable monthly; and that the only improvements made upon the prop-

[Humes v. Bernstein.]

·erty were placed there by Jacob Gurley, under a written contract between him and defendant, by which said Gurley was to build the house, and to have the use of it for three years, in consideration of having built and placed the house there."

This was all the evidence adduced, as to the value of the improvements, and of the rents, or use and occupation; and all the evidence as to the character of the defendant's possession.

On all the evidence adduced, the substance of which is above set out, the court charged the jury, on the request of the defendant, as follows:   (1.)   "If the jury find, from the evidence, that at the time the United States marshal conveyed to Walker, and Walker conveyed to plaintiffs, Bernstein was in the actual possession of the lot sued for, by himself or tenant, claiming it as his property, the question of title has nothing to do with the case, and they must find for the defendant."   (2.) "If the jury find, from the evidence, that Bernstein was in possession of the lot sued for, by himself or tenant, exercising acts of ownership over it, at the time the marshal conveyed to plaintiffs; the deed of Walker is void as to Bernstein, and their verdict must be for the defendant, regardless of the question of title."   (3.)   "If the evidence shows that, at the time Walker conveyed the lot in dispute to plaintiffs, Bernstein was in possession, by himself or tenant, exercising acts of ownership over it; Walker's deed to plaintiffs is void as to Bernstein, and their verdict must be for the defendant."   (4.)   "The jury must assess the value of the improvements from the evidence in the case, and it is immaterial whether they were put there by Bernstein or his tenant."   (5.)   "The jury must find the value of the rent of the property from the evidence in the case; and if there is no evidence as to what the value of the rent is, without the improvements, then they can not return a verdict for any rent."

The plaintiffs duly excepted to each of these charges, and they now assign each of them as error, together with the admission of the map as evidence.

HUMES, GORDON & SHEFFEY, and L. P. WALKER, for the appellants.

BRANDON & JONES, contra.

STONE, J.—In speaking of the form, configuration, and dimensions of real estate, when in controversy, a witness who is a surveyor, or expert, may introduce a map, or diagram, to aid him in making himself understood; and when this is done, the map or diagram may be submitted to the jury, as an aid to that body in understanding or remembering the witness' testi-

mony.—*Bridges v. McClendon*, 56 Ala. 327, and authorities cited. But such map, unless prepared according to section 868 of the Code of 1876, is only testimony to be weighed by the jury. It does not rise to the dignity of *prima facie* proof. Steele, who prepared the map, testified that he made it without having any title-papers before him, and, hence, without having the means of knowing whether or not it was correct. He further testified, on an examination of the two chains of title, that the map was not correct; and he gave the reasons why it was not correct. It, therefore, could not aid the jury in understanding and remembering his testimony, and it should not have been allowed to go to the jury. Its tendency was to confuse, rather than to enlighten that body.

This cause has been twice before in this court.—*Bernstein v. Humes*, 60 Ala. 582; *same v. same*, 71 Ala. 260. The testimony in the several trials has not been the same. The plaintiffs' title has been heretofore made to rest primarily on the deed of Acklen, sheriff, to Elliott, made in 1832. It is substantially undisputed, that, from 1826 to that time, Jemison was the owner of the property in dispute. Acklen's deed to Elliott describes the property conveyed as "part of lot number seventeen, fronting Gallatin street fifty feet, extending eastwardly seventy-three feet, sold as the property of said Isaac Jemison & Co." This property, with description corresponding substantially with that given in Acklen's deed, is conveyed in several mesne conveyances from Elliott down, until it became incorporated into the Bell Tavern property. We do not propose to repeat here what we said there, showing the various mesne conveyances. We refer to the report of second hearing of this case (71 Ala. 260), for a full statement. The contention of appellee is, that this deed is void for uncertainty in the description of the property intended to be conveyed. Without extrinsic aid, the dimensions of lot seventeen being given, it certainly is too indefinite. But, in construing written instruments, it is permissible to prove, not the unwritten intention of the parties, but the attendant facts and circumstances—the condition of the property, and of the parties at the time—as aids in the interpretation. In other words, you may put yourselves in the place of the contracting parties, and draw from that stand-point any legitimate inferences or conclusions (not conjectures) of fact, which tend to shed light on the intention of the parties.—*Chambers v. Ringstaff*, 69 Ala. 140; *Tennessee & Coosa R. R. Co. v. East Alabama Railway Co.*, at present term. Replying to the argument that the deed is void for uncertainty, we said, when this case was last here: "This can hardly be affirmed as matter of law, on the face of the deeds. We can not judicially know the extent of that lot's front on

[Humes v. Bernstein.]

Gallatin street. Its entire front on that street, looking alone to the deed, may have been only fifty feet; or, it may be that Jemison at that time owned a defined part of the lot fronting on Gallatin street, measuring fifty feet, and known as the property of said Isaac Jemison." So, we in effect ruled, that the deed was not necessarily void for uncertainty; but that, if certain supposed proof was made, and certain facts shown, the property might be identified, and the deed would thus become operative. One phase of the testimony, in the present record, tends to show that before Sheriff Acklen conveyed to Elliott, Jemison had disposed of his entire front of lot seventeen on Gallatin street, except the part in controversy, which it is contended lies south of the seven-feet alley.

In our last consideration of this case, we showed that the deed from Battle to Chappell, and from the latter to Bernstein, apparently called for only about ninety-two feet front on Gallatin street, and bounded the premises south on the Bell Tavern property. It followed, as we then said, if the property in controversy lay south of that line, Bernstein, by virtue of his deed from Chappell, did not appear to have either title or color of title to it. Benstein's title accrued in 1861, and we suppose he had no possession before that time. In fact, it is not shown that he took any possession of the property in dispute until he let the premises to Gurley in 1865. The present suit was commenced in 1871, much less than ten years from the time he put Gurley in possession; and, deducting the period of the war, much less than ten years from the time he purchased from Chappell. Now, if this be the *situs* of the disputed lot, whether Mrs. Hill, or any precedent owner to Bernstein, occupied the premises or not, neither Chappell nor Bernstein purchased such possessory right or claim; for the deeds do not embrace it. Nor is there proof, even if Mrs. Hill occupied the premises as a cow-lot, that that occupation or possession was kept up continuously, until Bernstein took possession through Gurley. Bernstein shows no right, by the testimony in this record, to tack his possession to that of Mrs. Hill, beyond the land covered by his deed. It follows that, when this suit was brought, in 1871, Bernstein had no possession which could operate a statutory bar, against any one's lawful right of entry, of any lands which lay outside of the boundaries given in his deed.

The remaining question arises on the asserted adverse holding by Bernstein, when Walker conveyed to the children of Mrs. Chapman. When this case was first in this court—60 Ala. 582—speaking of the infirmity of a title acquired by purchase while the property was adversely held by another, we said, as the result of our rulings, that to defeat the operation of a conveyance thus made, it was sufficient that another " is

[Humes v. Bernstein.]

in possession, asserts the right to retain the possession, and that his claim is adverse to that of plaintiff's grantor." And when the case was last here—71 Ala. 260—we said: "To avoid a deed made by one out of possession, it is enough if there be one in adverse possession, exercising acts of ownership, and claiming to be rightfully in possession. Color of title is not necessary." The effect of these rulings was, and is, that it is not enough to avoid a conveyance of property that it is in the possession of another, who is exercising acts of ownership over it. Acts of ownership, such as clearing land, erecting houses, &c., are not necessarily claim of ownership, or of right. These may be done by a tenant, as they appear to have been done by Gurley, without any claim of right. Or, they may be the acts of a mere trespasser or adventurer, without claim of right. Or, they may be the result of a mistaken belief that the true line embraces the land on which the improvement is made, but with no intention of claiming if not within the area covered by the title. In either case supposed, unless the possession is held with the intention of claiming the property, without regard to the title, or true dividing line, such possession or holding is not adverse, and will neither ripen into a title by lapse of time, nor defeat the operation of a conveyance by the rightful owner. *Brown v. Cockrell*, 33 Ala. 38; *Alexander v. Wheeler*, 69 Ala. 332. It follows, that while acts, such as are usually done or performed only by the owner, or one asserting ownership, are legal evidence to go before the jury on the question of adverse holding, or of asserted claim of right, they are still only evidence to be weighed with the other evidence. They are not the equivalent of a claim of right. The latter is a conclusion of fact, to be found, or not found, by the jury; the former is only testimony tending to prove such fact. But such acts need not be done by the party himself. He may have them done by an agent or tenant; and if done for him, they have the same effect in law, as if done by him.

In the charges given and excepted to are the following errors: Charge 1 is faulty in this, that the rule against maintenance does not apply, when the sale is what is called a judicial sale, or is made by a public officer, under legal process. Charges 2 and 3 omit all mention of claim of right, as a necessary ingredient in the adverse holding which would avoid Walker's conveyance to the plaintiffs. Under the evidence, that qualifying clause should have been inserted in these charges.

If the defendant placed, or had placed, the improvements on the premises, in the *bona fide* belief that the property was his, then his claim for improvements should be entertained under sections 2951 *et seq.*, Code of 1876.—*N. O. & S. R. R.*

[Humes v. Bernstein.]

*Co. v. Jones*, 68 Ala. 48. Charge 4 is faulty, in that it pretermits the question of *bona fides*. The case cited will furnish a sufficient guide on another trial.

It is not deemed necessary to comment on section 2966 of the Code. If the land in controversy is not embraced in the terms of Bernstein's title, then he had no color of title, and the statute does not apply to him. If it is embraced in his deed, then it would seem he was in adverse possession under claim of right, and plaintiffs must fail on that ground, if for no other reason.

We have several times spoken of plaintiffs' claim contingently. We do not thereby intend to say, that the construction of the deed is a question for the jury. They must judge of, and determine the concomitant facts, which are aids in interpreting the instrument; but the court must construe the instrument. This is done by a hypothetical charge, stating the result, if certain facts are found to be proved. The jury passes on the parol testimony, and determines what facts are proved. The court must determine what influence such facts, if found to exist, must exert, in interpreting the writing. The court thus interprets the writing, aided by the surrounding facts which the jury find to be proven. We, in *Chambers v. Ringstaff*, *supra*, laid down the true rule. We have spoken of it contingently, for another reason. It seems to be undisputed that Bernstein's deed—the quit-claim clause of it—conveys the lot on which the little brick house once stood. Some of the testimony in the record tends to show that the lot in controversy in this suit is the lot on which that house stood. Other witnesses testify differently. It is not for us to determine the weight of the evidence. The jury must decide that, under proper instructions.

The last charge given, numbered five, is also erroneous. If, under the rules declared above, the plaintiffs are entitled to recover, they are entitled to rents, at least to the extent Bernstein has realized them; and if, under the testimony, the jury find that Bernstein had the improvements made, in the mistaken, though honest belief, that the land was covered by his deed— but with no intention of claiming the lot if not embraced in his deed—then he will be entitled to the value of his improvements, but must answer for rents during the time they were being put up. The law does not contemplate that a mere trespasser, though innocently, on another's land, shall make any profit thereby.

The last paragraph above relates alone to the question of rents, in the event plaintiffs are entitled to recover under the rules above laid down. The *onus* rests on them, first, to show such right, as we have intimated above it may be shown. This,

if done, will shift the *onus* to the defendant, to make good one line of his defense; either that his deed embraces the disputed ground—in other words, that the little brick house stood on the lot sued for; or, that when Walker conveyed to the Chapman heirs, he, Bernstein, was in adverse possession under claim of right as we have explained that phrase.

Reversed and remanded.

BRICKELL, C. J., not sitting.